IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JENNIFER LINCOLN, et al.    :       CIVIL ACTION
                           :
       v.              :
                           :
DETECTIVE LEO HANSHAW, et al. :     No. 08-4207

MEMORANDUM

Dalzell, J.                              May 6, 2009

        Plaintiffs Jennifer Lincoln, Daniel Zimmerman, and

Gregory Zimmerman sued Detectives Leo Hanshaw and Arthur Erle of

the Upper Darby Police Department, their supervisor,

Superintendent Michael Chitwood, and Upper Darby Township for

allegedly violating plaintiffs' Fourth and Fourteenth Amendment

rights and for state law false arrest and malicious prosecution

claims.[1]  The defendants have moved for summary judgment.

I.    **Factual Background**

        On April 11, 2006, Brownwell Berry, the manager of the

Dollar Den, 600 South Avenue in Secane, Pennsylvania, called the

Upper Darby Township Police to report that someone had broken

into the store the previous night and had stolen a plexiglass

---

[1]The plaintiffs also alleged a false light invasion of
privacy claim against Chitwood.  We will grant summary judgment
as to this claim because the plaintiffs acknowledge that the
statute of limitations bars it.

case containing scratch-off lottery tickets.  Def.'s Mem. Ex. A[2],

Ex. V [Det. Hanshaw Dep.] at 31, 35-37; ; Pl.'s Ex. E [Lincoln

Dep.] at 85.  Brownwell Berry then called the owner of the Dollar

Den, Jennifer Lincoln, and she arrived shortly thereafter.

Def.'s Mem. Ex. A; Lincoln Dep. at 85-86.

Detective Leo Hanshaw was assigned the case, went to

the Dollar Den, and spoke with Lincoln, who he met for the first

time that day.  Hanshaw Dep. at 32-33.  Hanshaw requested and

received a list of current and former employees from Lincoln.

Def.'s Mem. Ex. A, Det. Hanshaw Dep. at 34-35.  He suspected that

someone who knew about the store's operation had burglarized it.

Id.

Over the next several days, Hanshaw contacted the

---

[2]The plaintiffs object to the use of the police reports and
other police documents in the defendants' motion for summary
judgment because they claim these documents are hearsay.  But
hearsay statements can be considered on summary judgment if they
are "capable of admission at trial."  Shelton v. Univ. of Med. &
Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000).  The
portions of those documents that consist of the officer's
personal observations are admissible under the public records
exception applicable to civil proceedings such as this one.  Fed.
R. Evid. 803(8)(C); Beech Aircraft Corp. v. Rainey, 488 U.S. 153,
169-170 (1988).  Those portions of the police records that
contain statements of witnesses -- e.g., the statements of Barry
Mapp and the probable cause affidavit -- are also covered by this
exception.  The statements themselves are not hearsay because
they are not offered for their truth but merely that they were
said to the police.

Pennsylvania Lottery Commission to find out if any of the stolen tickets had been cashed in. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 38. The Lottery Commission faxed Hanshaw a list of the lottery ticket numbers assigned to the Dollar Den and the locations where they were cashed. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 38-39. Hanshaw determined that someone had cashed several lottery tickets from the Dollar Den at the Pantry One located at 1023 South Avenue on April 11, 2006. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 39. Hanshaw went to the Pantry One to view surveillance video, which showed a man cashing in the tickets. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 39-40. Upper Darby Police later identified the man as Barry Mapp[3], and determined that the tickets he had cashed were stolen from the Dollar Den. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 40.

On April 26, 2006, Upper Darby Police arrested Mapp at his home. Def.'s Mem. Ex. A; Det. Hanshaw Dep. at 53. Mapp admitted he burglarized the Dollar Den, and signed a statement to that effect. Def.'s Mem. Ex. A, Ex. C. But that was not the only thing Mapp told the police.

Detectives Arthur Erle and Hanshaw interviewed Mapp at

---

[3]Barry Mapp had worked for Lincoln at the Dollar Den in the past, dressing up as a bunny one Easter. Lincoln Dep. at 78-79.

the police station.  Def.'s Mem. Ex. E, S [Erle Dep.] at 18, 27-
28, 34-36, 41-44; Hanshaw Dep. at 49-52, 70-71.  Mapp stated that
he had gone back to burglarize the Dollar Den again on April 16,
2006, but after he got inside he was apprehended by two men, who
Mapp referred to as "her [Lincoln's] boyfriend and his brother."
Def.'s Mem. Ex. C.  He described the "boyfriend" as a "white
male, 34-35 [years old], big stomach, about 6'3" - 6'4",
brown/black hair, has a goatte [sic], and tattoos."  Id.  Mapp
described the "boyfriend's brother" as a "white male, 27-28
[years old], with tattoos, blonde short hair."  Id.

       According to Mapp, these two men proceeded to beat him
up, detain him, and then placed a call to Lincoln who then
arrived at the Dollar Den and offered Mapp a deal: she could call
the police and have him arrested, or he could let her cut him
with a box-cutter.  Id.  Mapp stated that he opted for the
latter, and she thereupon cut his face and his clothes.  Id.
After the cutting, they released Mapp, and he fled.  Id.  After
some of Mapp's neighbors called the Upper Darby Police and
neighboring Ridley Township Police found him in the parking lot
of the apartment complex where he lived, his face bleeding and
clothing slashed.  Id; Pl.'s Mem. Ex. M [Mapp Dep.] at 82.  In
accordance with his agreement with Lincoln, Mapp told the police

4

that his face had been cut during a drug deal gone wrong in the parking lot of the Pantry One in Upper Darby. Def.'s Mem. Ex. E; Pl.'s Mem. Ex. M [Mapp Dep.] at 82. Paramedics then took him to a local hospital.[4] Id.

About a week after April 26, 2006, Hanshaw called Lincoln into the police station to question her about Mapp's story. Det. Hanshaw Dep. at 63-64; Lincoln Dep. at 154-55. Lincoln denied Mapp's version of events. Lincoln Dep. at 155-56; Det. Hanshaw Dep. at 64. According to Lincoln, Hanshaw became angry at her denials.[5] Lincoln Dep. at 158.

Lincoln had come to the police station with her

_____

[4]While at the hospital, Mapp told those attending him that a girl or his girlfriend had cut him. Pl.'s Mem. Ex. D; Def.'s Ex. N. Mapp also testified that he told prison administrators that he could not be moved to a particular unit because the people who had cut him were there. Mapp Dep. at 106-08. Mapp testified that he had lied to the prison administrators and made up the names of his incarcerated assailants to avoid a harsher housing unit. Id. There is no evidence that Detective Erle or Hanshaw knew about the statements Mapp made in prison or at the hospital.

[5]According to Lincoln, this was not the first time she had a disagreeable conversation with Hanshaw. Lincoln testified that about a week or two after the burglary she called Hanshaw to find out if there was anything she could do to assist in the investigation. Lincoln Dep. at 131. During the course of that call she explained to Hanshaw that she had started the Dollar Den so she could employ recovering addicts and released convicts to help them build up an employment history. Id. at 131-32. She recalled Hanshaw being quite hostile to this endeavor. Id.

boyfriend, Daniel Zimmerman. Lincoln Dep. at 152. Hanshaw and Daniel Zimmerman had a connection: Zimmerman had fathered a child with Hanshaw's wife, Shannon, before Hanshaw had married her. Def.'s Mem. Ex. Z [D. Zimmerman Dep.] at 17, 20; Det. Hanshaw Dep. at 18; Def.'s Mem. Ex. Q [S. Hanshaw Dep.] at 8. Shannon Hanshaw and Zimmerman were involved in a child support dispute, and he owed her several thousand dollars. D. Zimmerman Dep. at 35-36, 96; S. Hanshaw Dep. at 25-26, 37. Hanshaw testified that it was only after this interview that he learned that Daniel Zimmerman was Lincoln's boyfriend. Det. Hanshaw Dep. at 83; Erle Dep. at 57.

Hanshaw testified that about a day or two after meeting with Lincoln he realized that the "her boyfriend" in Mapp's statement might be Daniel Zimmerman. Det. Hanshaw Dep. at 86. Hanshaw then notified his supervisor, Captain David Madonna, about the potential conflict of interest. Det. Hanshaw Dep. at 87; Def.'s Mem. Ex. T [Madonna Dep.] at 47-49; Erle Dep. at 55-57. Captain Madonna reassigned the Mapp assault case to Detective Erle.[6] Det. Hanshaw Dep. at 76, 90; Erle Dep. at 55-

---

[6]According to Captain Madonna, the Upper Darby Police Department has a policy of not permitting detectives with any personal connection to targets from taking the lead on a case. Madonna Dep. at 51-52. But the policy is not so specific as to

57; Madonna Dep. at 50.

On October 5, 2006, Detectives Hanshaw and Erle[7]
interviewed Mapp in prison and in the presence of his attorney.
Def.'s Mem. Ex. D; Erle Dep. at 85, 103-05; Det. Hanshaw Dep. at
110-112.  Mapp gave another statement, which was much the same as
what he gave on April 26, 2006.  Def.'s Mem. Exs. D.  He picked
out Jennifer Lincoln and Daniel Zimmerman from photo arrays.
Def.'s Mem. Ex. D; Erle Dep. at 103-05.  He described the second
male assailant as a "short white male[,] blonde, dirty blonde
hair, stocky for his size.  He looked like he hadn't shaved in a
little while.  He was mid to late 20's.  Younger than the male
#1."  Def.'s Mem. Ex. D.

Five days later, Detective Erle reviewed an April 16,
2006 Ridley Township Police Report authored by Officer Lockhart
of that Department.  Def.'s Mem. Ex. F, X.  According to that
document, Officer Lockhart responded to a report of a stabbing at
333 North Avenue in Upper Darby.  Def.'s Mem. Ex. F, X; Pl.'s Ex.

---

require that the detectives be walled off from the investigation.
Id. at 52.

[7]The Upper Darby Police Department has two squads of
detectives consisting of seven or eight detectives each.  Erle
Dep. at 16-17.  Detective Erle referred to his professional
relationship with Detective Hanshaw as an "informal partnership",
in which they "work together on a lot of cases."  Id. at 146.

C.  When he arrived, he found Barry Mapp in an ambulance,
bleeding from the face.  <u>Id.</u>  Mapp told Lockhart that he had been
robbed at the Pantry One store at 624 South Avenue in Ridley
Township by two males in a dark Buick Lesabre.  <u>Id.</u>  Lockhart
went to the Pantry One to review the surveillance video of the
parking lot.  <u>Id.</u>  He found no evidence of a Black Lesabre or men
matching the description Mapp had given him.  <u>Id.</u>  The store
manager apparently told Lockhart that a customer had come in and
told the manager that a fight had occurred in the parking lot of
the Dollar Den in Upper Darby.  <u>Id.</u>

On October 12, 2006, Detective Erle completed an
application for arrest warrants for Jennifer Lincoln and Daniel
Zimmerman, which a judge signed that same day.  Def.'s Mem. Ex.
E, H.  The probable cause affidavit, signed by Detective Erle,
consisted only of information gleaned from Mapp's statement and
photo array identifications.  <u>Id.</u>

Detectives Hanshaw and Erle on October 24 went to
Jennifer Lincoln's home, arrested her, and brought her to the
Upper Darby Police Department for processing.  Def.'s Mem. Ex. I.
Daniel Zimmerman surrendered to police on November 2, 2006.  <u>Id.</u>

Detective Jeffery Thrash sent an email on October 26,
2006 to Detective Erle about a tip concerning the investigation.

8

Def.'s Mem. Ex. J; Erle Dep. at 109. Thrash told Erle that a Diane Murphy had called and said that Gregory Zimmerman[8] was the third person involved in the Mapp assault.[9] Id. Based on Diane Murphy's tip, Erle had Hanshaw put together a photo array that included Gregory Zimmerman. Erle Dep. at 116-118.

The next day, Detective Hanshaw went to the prison where Mapp was held and presented him with a photo array. Pl.'s Mem. Ex. B at 135, 137. Mapp identified Gregory Zimmerman as the second man who assaulted him. Id. at 138. Based on Mapp's identification, Erle completed an affidavit of probable cause for a warrant to arrest Gregory Zimmerman, which a judge signed on October 28. Def.'s Mem. Ex. K. Detectives Hanshaw and Erle

---

[8]Daniel Zimmerman has at least one other brother. Def.'s Mem. Ex. Y at 96.

[9]On October 30, 2006, after drafting the probable cause affidavit for Gregory Zimmerman, Erle spoke with Diane Murphy. Erle Dep. at 112, 156. She told him that Alexis Morrow, Gregory Zimmerman's then-estranged wife, told Murphy that Gregory was involved in the Mapp assault. Id. at 156. That same day, Morrow called Murphy's house while Erle was there, and he spoke with Morrow. Id. at 160. Morrow told Erle that Gregory had told her that he had been involved in the assault. Id. at 165. Erle testified that Morrow did not want to come down to the station and talk in person because she was afraid of her husband. Id. at 169. Morrow called again on November 2, 2006 to say that Gregory was planning to leave town and move upstate. Id. at 168.
Sheryl O'Rourke, the Zimmermans' mother, testified that she spoke with Alexis Morrow, and Alexis had stated to her that she had never spoken with the police. Def.'s Mem. Ex. P at 94.

arrested Gregory Zimmerman at his mother's house on November 13, 2006.[10]  Def.'s Mem. Ex. I.  At that time, Gregory Zimmerman was six feet tall, had dark brown hair, and weighed 178 lbs.  Pl.'s Mem. Ex. H at 166.

On February 1, 2007, the Court of Common Pleas of Delaware County held a preliminary hearing on the criminal case against the plaintiffs for their alleged involvement in the Mapp assault.  Def.'s Mem. Ex. N.  The Commonwealth called Barry Mapp as its only witness.  He testified much as he had in his April 26 and October 5, 2006 statements and identified the plaintiffs as his assailants.  Id.  The Court held the case over for trial. Id.  After a trial, the plaintiffs were acquitted of all charges on July 13, 2007.  Def.'s Mem. Ex. O.

## II.  __Analysis__[11]

---

[10]Detectives Erle and Hanshaw accompanied by the Eddystone Police, went to Gregory Zimmerman's house to arrest him.  Erle Dep. at 153-155.  They were initially met by Zimmerman's mother, Sheryl O'Rourke.  Id.  She told the police that Zimmerman was not in the house, but told the police they could enter and check for him.  Id.  The police told O'Rourke that if she was lying she would be arrested for hindering the arrest.  Id.  The police discovered Zimmerman hiding under a pile of clothes in the house. Id.  The police arrested both Zimmerman and his mother.  Id.

[11]Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the

Plaintiffs sue Erle and Hanshaw for false arrest and malicious prosecution in violation of plaintiffs' Fourth and Fourteenth Amendment rights. They also assert that Hanshaw's and Erle's investigation was so tainted with conflict of interest, and failure to use reasonable methods, as to violate the plaintiffs' Fourteenth Amendment substantive due process rights. They contend that these problems with the investigation also make

---

evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. <u>Id.</u> at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" <u>Id.</u> at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982). It is not enough to discredit the moving party's evidence, the non-moving party is required to "present <u>affirmative</u> evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. <u>See id.</u> at 249-50. Also, if the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

out a <u>Monell</u> claim against Upper Darby Township because the
Township was aware that its policies could lead to such a
conflict of interest, yet did nothing to prevent it.  The
plaintiffs also assert that the defendants were involved in a
conspiracy to violate the plaintiffs' civil rights.

We will first consider the false arrest and malicious
prosecution claims together and then turn to those claims related
to the constitutionality of the investigation of the plaintiffs.
We will last consider the <u>Monell</u> and conspiracy claims.

### A.   <u>False Arrest and Malicious Prosecution</u>[12]

Plaintiffs argue that defendants are liable for false
arrest because they arrested the plaintiffs without probable
cause.  They assert that the lack of probable cause at the arrest
stage was compounded at the prosecution stage.

Police officers can be liable for malicious prosecution
even though the prosecutor is the one who "initiates" the case if
the police knowingly provide the prosecutor with false
information.  <u>See Reed v. City of Chicago</u>, 77 F.3d 1049, 1053

---

[12]In the analysis, we will focus our attention on the
federal rights here because the plaintiffs' state law false
arrest and malicious prosecution claims are coextensive and
require the same showings as the parallel federal claims in
question.  <u>Patzig v. O'Neil</u>, 577 F.2d 841, 851 (3d Cir.1978).

(7th Cir. 1996) ("the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor").  Here, plaintiffs contend that the defendants omitted material information from the probable cause affidavits and the prosecutor relied on the facts in those affidavits to initiate the criminal case against the plaintiffs. Pl.'s Mem. at 32-33. Therefore, the viability of the false arrest and malicious prosecution claims depends on whether the October 12 and October 27, 2006 affidavits of probable cause pass constitutional muster.

"[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir.1995).  We apply an objective test to determine whether the police effected a proper arrest, and focus on "the facts available to the officers at the moment of arrest." Beck v. Ohio, 379 U.S. 89, 96 (1964); Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994).

Probable cause does not require that the police have

evidence sufficient to establish guilt beyond a reasonable doubt.

Id; United States v. Glasser, 750 F.2d 1197, 1205 (3d Cir. 1984).

"The validity of the arrest does not depend on whether the

suspect actually committed a crime" and the "later acquitt[al] of

the offense for which he is arrested is irrelevant to the

validity of the arrest." Michigan v. DeFillippo, 443 U.S. 31, 36

(1979). "An officer who has probable cause to arrest is not

required to conduct further investigation for exculpatory

evidence or to pursue the possibility that the suspected offender

is innocent." Vassalo v. Timoney, 2001 WL 1243517, at *7 (E.D.

Pa. Oct.15, 2001) (citing Brodnicki v. City of Omaha, 75 F.3d

1261, 1264 (8th Cir.), cert. denied, 519 U.S. 867 (1996);

Simkunas v. Tardi, 930 F.2d 1287, 1292 (7th Cir. 1991); Marx v.

Gumbinner, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990); Kompare v.

Stein, 801 F.2d 883, 890 (7th Cir. 1986)).

Whether a police officer had probable cause is

generally a question for the jury, but a district court may

conclude "that probable cause did exist as a matter of law if the

evidence, viewed most favorably to Plaintiff, reasonably would

not support a contrary factual finding." Sherwood v. Mulvihill,

113 F.3d 396, 401 (3d Cir. 1997). Here, the victim of the crime

described an assault against him and picked out each of the

14

individuals involved from a photo array.  This sufficed to establish probable cause to arrest the plaintiffs because on these facts a reasonable person would believe that the plaintiffs committed a crime.

Since the warrant application here establishes probable cause on its face, the only way the defendants can prevail in their claim is if they can point to evidence "that [the defendants] recklessly disregarded the truth in [their] warrant application, and that a warrant application based on what [the defendants] should have told the judge would have lacked probable cause."  Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000) (emphasis in original).  This does not imply that the officer must include every single fact unearthed or procedure used during the course of the investigation.  Id. at 787.  Instead, "omissions are made with reckless disregard if an officer withholds a fact in his ken that any reasonable person would have known...was the kind of thing the judge would wish to know."  Id. at 788.

There are two broad categories of omissions that judges would wish to know about and which would assist them in assessing probable cause: facts that exculpate the arrestee and those that undermine the reliability of statements used in the affidavit.

See id. at 788. (finding that the significant height differential between the arrestee and the witness's initial description and the failure of another eyewitness to identify the arrestee were things a judge would wish to know).  A warrant application presents us with a fixed set of facts in the form of an affidavit from which we evaluate probable case.  That affidavit consists of witness statements, the officer's personal observations, and facts unearthed in the course of an investigation that together must provide a basis to believe the arrestee committed a crime. The types of omissions that affect a probable cause determination based on an affidavit of this kind are omissions that undermine the constituent parts of the affidavit.  Such gaps would either call into question the reliability of the witness and officer statements -- e.g., the witness was intoxicated -- or tend to exculpate the arrestee -- e.g., the arrestee was elsewhere at the time of the crime.

It is not enough for the defendants to omit "thing[s] the judge would wish to know"; the effect of these omissions must also be material.  Merkle v. Upper Dublin School Dist., 211 F.3d 782, 789 (3d Cir. 2000) (citing Franks v. Delaware, 438 U.S. 154, 171-72 (1978)).  To determine the omissions' materiality, "we excise the offending inaccuracies and insert the facts recklessly

omitted, and then determine whether or not the 'corrected'
warrant affidavit would establish probable cause." <u>Wilson</u>, 212
F.3d at 789.  If the facts in the "corrected" affidavit amount to
probable cause, then summary judgment is appropriately granted.
<u>Id.</u>

Wilson provides a good example of how to engage in this
process as well as provides helpful guidance on what amounts to a
material omission.  <u>Id.</u> at 783.  There, the plaintiff was
arrested for an armed robbery for which he was innocent.  He sued
the police officer, alleging that the arrest was without probable
cause.  The application stated that the two eyewitness victims
had told police that the assailant was between 6'3" and 6'5"
tall, one of the witnesses identified the plaintiff from a
photographic array, and a third witness had seen the plaintiff in
the vicinity near the time of the robbery.  What the officer
omitted was that the plaintiff was 5'11", the other eyewitness
victim did not pick out the plaintiff from the photo array, and
the time at which the third witness said she saw the plaintiff
would have meant he was not at the scene of the robbery.

All these facts were things that a judge would wish to
know, but when added back into the application, they did not
undermine the finding of probable cause.  <u>Id.</u> at 790.  Our Court

of Appeals held that "a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause" unless there was "exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers." Id. The Court noted that her identification of the plaintiff contradicted her previous assertion that the assailant was between 6'3" and 6'5", but found that "this indication of unreliability [did] not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification." Id. at 791. The Court held that the three omitted facts did not undo a finding of probable cause because "when weighed against the inculpatory facts, [they] were not strong enough to undermine a finding of probable cause." Id. at 791-92.

The plaintiffs here contend that eight items were improperly omitted from the warrant application: (1) Shannon Hanshaw had a child with Daniel Zimmerman, and she is married to Detective Hanshaw; (2) Hanshaw and Erle informed Mapp's mother of the reason for his arrest three hours in advance; (3) Mapp was incarcerated on both April 26 and October 5, 2006; (4) Mapp's physical description was vastly different than Gregory Zimmerman's actual description; (5) the Upper Darby Police failed

18

to include the fact that they created a photo array that included Gregory Zimmerman because they received a call from Dianne Murray claiming that Gregory's then-estranged wife had told her that Gregory was involved in assaulting Mapp; (6) the Upper Darby Police never applied for a search warrant to seek physical evidence from the Dollar Den; (7) the Upper Darby Police had no evidence that Mapp's blood was in the Dollar Den; and (8) the Upper Darby police did not examine the telephone records from the Dollar Den to see if someone made a call to Jennifer Lincoln on April 16, 2006 to corroborate Mapp's story.  Pl.'s Mem. at 43-45.

Plaintiffs insist that if these omitted facts were included in the affidavit, the application would not have supported a finding of probable cause.  But of these eight omissions, only (4) -- the discrepancies in Mapp's description of Gregory Zimmerman -- is the sort of new fact that a judge would wish to know.  All of the other omissions are tangential to the facts asserted in the affidavit and simply do not affect the finding of probable cause, as the following canvass shows.

### 1.  <u>Hanshaw's Animus</u>

Plaintiffs contend that a magistrate would want to know of the Hanshaw-Zimmerman connection because it establishes the

bias that would infect the investigation.  Plaintiffs argue that
this animus suffices to create a question of material fact
because one could reasonably infer from it that the defendants
acted with malice in the course of their investigation.

We will not impute to defendants the requisite malice
to infer that Hanshaw manipulated the investigative process to
create probable cause without <u>some</u> evidence that his animus rises
to such a malignant level.  What we can reasonably infer from the
record is that Hanshaw did not like Zimmerman because the latter
owed the former's wife child support.  From this inferred fact,
the plaintiffs would have us also infer malice on Hanshaw's part.
But the record does not include any evidence that Hanshaw and
Zimmerman had any prior, direct conflict.  There is no history of
confrontations between the two or of Hanshaw previously seeking
retribution of any kind.  Without <u>some</u> evidence that Hanshaw was
willing to act on his animus, we cannot infer malice from the
existence of child support litigation between Zimmerman and
Hanshaw's wife.  Such an inference on such a record stretches too
far, and thus would be unreasonable.

Plaintiffs argue that "[m]alice may be inferred from
the absence of probable cause."  <u>Lippay v. Christos</u>, 996 F.2d
1490, 1502 (3d Cir. 1993).  To properly apply the holding of

_Lippay_, plaintiffs must establish a lack of probable cause, from which we indeed could conclude that defendants' malice worked against them. But that is not the case here. Plaintiffs want us to infer active malice from Hanshaw's unacted-upon animus so the plaintiffs can establish the absence of probable cause on that latency alone. But this is not _Lippay_'s teaching. Here there was ample probable cause and whatever animus Hanshaw may have harbored does not undermine those inconvenient facts.

### 2. Mapp's Opportunity to Lie

Plaintiffs contend that Erle should have included the fact that he and Hanshaw told Mapp's mother about the reason for his arrest before effecting it and the fact that Mapp was incarcerated from April 26 through October 5, 2006 in the probable cause affidavit because a judge would wish to know that Mapp had the time and opportunity to concoct and perfect his story about Lincoln and the brothers Zimmerman. There is no denying that these facts are relevant in a broad sense. But the police are not required to include _every_ relevant fact in their probable cause affidavits. _Wilson_, 212 F.3d at 787.

Plaintiffs argue that these facts go to Mapp's credibility, which is of central concern when examining the

affidavit, but the facts they seek to have included in the "corrected" affidavit do not provide any useful insight into Mapp's credibility.  His statements are no more or less reliable if these facts had been included in the affidavit.  These facts only establish that Mapp had an opportunity to lie, not that he did lie.  Facts that establish the basic opportunity to lie, without more, are not helpful because each time one opens his or her mouth one can lie.  The facts the plaintiffs wish to include do not help distinguish this instance of potential fabrication from any other.

We recognize that we must accept Lincoln's statement that Mapp's story is a lie, but whether Mapp lied or not is irrelevant to the probable cause analysis.  What matters is whether the police could reasonably believe Mapp at the time.  These two omissions would not assist us or a magistrate reviewing Erle's probable cause affidavits in determining whether the police could reasonably believe Mapp.  A judge would want to know, for example, that at the time the detectives drafted the probable cause affidavit they knew that Mapp had told ever-shifting stories about how he was assaulted.  But the plaintiffs have no evidence that the detectives knew any such thing.

### 3.    <u>Tip Concerning Gregory Zimmerman</u>

Plaintiffs claim that the warrant application should have revealed the fact that police included Gregory Zimmerman in a photo array because of a tip consisting of hearsay.  Although such hearsay would not usually be admissible at a criminal trial, and may be of questionable value as an investigative lead, its use in the course of a criminal investigation does not have constitutional implications.  The police's use of Diane Murphy's multiple hearsay statement merely illustrates that the police relied on a questionable source when developing a photo array.  But Mapp indeed picked Gregory Zimmerman from the photo array.  It is <u>that</u> identification that is relevant.  How Gregory's photo got in the array is of no moment.  What matters is that Mapp picked it.

### 4.    <u>Investigative Techniques Not Used</u>

Omissions (6)-(8) all involve investigative techniques the police did not use.  On its face, each warrant application here affirmatively establishes probable cause.  Including investigative steps <u>not</u> taken would not affect the reliability of the information in the affidavit, and would not tend to exculpate any of the defendants.

We note first that officers are not constitutionally obliged to continue their investigation after they have established probable cause.  <u>Vassalo</u>, 2001 WL 1243517, at *7 (citations omitted).  Second, it would be absurd to require police officers to enumerate every investigative step <u>not</u> taken -- ultimately, of course, an interminable enterprise.  There is always something else a police officer could have done, but once probable cause is established, the Constitution does not require that they go any further.  No judge -- at least none with an appreciation for the shortness of life -- would wish that a probable cause affidavit contain a catalogue of investigative steps that police did <u>not</u> take.

### 5. Discrepancies Between Mapp's Initial Description and His Identification of Gregory Zimmerman

The only fact that a judge would wish to know, but that was not included in the affidavits, concerns the discrepancy between Mapp's initial description of the second assailant and his selection of Gregory Zimmerman from the photo array.  This fact does undermine the reliability of Mapp's identification.  But like the identification in <u>Wilson</u>, this added unreliability does not "fatally undermine [Mapp's] forceful positive identification."  <u>Wilson</u>, 212 F.3d at 791.  Thus, even after

24

including the omitted fact that a judge would wish to know in the affidavit, we find that no reasonable jury could conclude that the officers did not have probable cause at the time of the plaintiffs' arrest.

B.     **Substantive Due Process Right to Investigation**

Plaintiffs also suggest that the investigation leading to their arrest and prosecution was so inadequate that it amounted to a violation of their Fourteenth Amendment substantive due process rights.  They make two separate, but interlocking, claims: first, that Hanshaw's animus toward Daniel Zimmerman led to a biased investigation, and, second, that the defendants failed to use various investigative techniques to test Mapp's allegations against the plaintiffs.  Pl.'s Mem. at 50.  Based on the record before us, the plaintiffs cannot establish that the defendants violated their constitutional rights.

Before we analyze the plaintiffs' claims under the umbrella of substantive due process, we must determine whether another constitutional provision "provides an explicit textual source of constitutional protection against a particular sort of government behavior, [then that provision], not the more generalized notion of substantive due process, must be the guide

for analyzing these claims." <u>Albright v. Oliver</u>, 510 U.S. 266,
273 (1994) (internal quotations omitted).  Plaintiffs claim that
the police failed to use investigative techniques to test Mapp's
allegations and that this failure implicates Fourth Amendment
protections.

        Plaintiffs contend that they were deprived of their
liberty as a result of an inadequate investigation that failed to
use methods that could have tested the veracity of Mapp's
statement, and which presumably would have exonerated the
plaintiffs.  The police's duty to investigate falls within the
bounds of the Fourth Amendment which prevents the police from
depriving people of their liberty, <u>i.e.</u>, arresting them, without
first having probable cause.  As we have noted at length, the
police have no constitutional duty to investigate further once
they establish probable cause.  <u>Vassalo</u>, 2001 WL 1243517, at *7
(citations omitted).  We have already held the police here had
probable cause when they decided to arrest the plaintiffs and
were under no constitutional duty to continue investigating.
Thus, the plaintiffs' claim that the defendants failed to take
investigate steps to test Mapp's assertions is foreclosed by our
finding that the police had probable cause.

        The only remaining basis for a substantive due process

claim is that Hanshaw's involvement in the investigation somehow violated the plaintiffs' rights. We can safely say that no other constitutional provision covers this particular situation. Thus, if such a claim exists, it can only be found in substantive due process.

But to invoke substantive due process one must establish that the governmental action has abridged some right fundamental to our concept of ordered liberty. Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). The Supreme Court has recognized a variety of such fundamental rights, e.g., to marry, to have children, to use contraception, to get an abortion, to use interstate travel. See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (collecting cases). Substantive due process analysis is a two step process. We begin with "a careful description of the asserted right," id; Reno v. Flores, 507 U.S. 292, 301-302 (1993), then we examine whether this right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." Glucksberg, 521 U.S. at 721; Flores, 507 U.S. at 301-302; Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977); Palko v. Connecticut, 302 U.S. 319, 325 (1937)

What fundamental right do the plaintiffs implicate?

They assert that the defendants erred by involving Hanshaw in the investigation despite knowing of the animus he had for Daniel Zimmerman, a target of that investigation. The right implicated here would be the right of a target to be free from an investigation involving someone who has animus towards him. Plaintiffs cite not a single case establishing, or even intimating, the existence of such a right. We, too, have found no basis for such a hypothesized right. We are mindful of the Supreme Court's admonition that courts should tread carefully and be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins, 503 U.S. at 125. We thus will not manufacture the right plaintiffs need to sustain their claim.

We are not surprised that the plaintiffs find no basis for the right they assert. Such a right would hamstring police departments, especially smaller ones, from conducting any investigation at all. The due process clause protects people from arbitrary acts of government officials, but it does not govern the staffing decisions of their local police department. Nor does that clause grant courts the power to determine whether investigations are good enough compared to . . . what? Our task,

to decide whether government conduct violated the Constitution or the laws of the United States, <u>see</u> <u>Wayte v. United States</u>, 470 U.S. 598, 607-08 (1985), is difficult enough without engaging in an inquiry so untethered to readily discernible legal standards.

"The touchstone of due process is the protection of the individual against arbitrary action of government." <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974). The Due Process Clause prevents "government officials from abusing their power, or employing it as an instrument of oppression." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998) (internal quotations omitted) (quoting <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 126 (1992)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." <u>Id.</u> (internal quotations and citations omitted). The "action must be so ill-conceived or malicious that it 'shocks the conscience.'" <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 375 (3d Cir. 1998).

We recognize that the "shocks the conscience" test is a flexible one, stretching and contracting depending on the specific circumstances under which the complained-of government action occurred. <u>Lewis</u>, 523 U.S. at 850. But we can safely say that the decision to include Hanshaw in the investigation despite

his animus towards Daniel Zimmerman does not shock the conscience, and no reasonable jury could find that it does. As we noted earlier, the plaintiffs provide no evidence that Hanshaw's supposed animus had ever caused him to act against Zimmerman. Absent such evidence, any negative inference here is unreasonable, and there is <u>no</u> basis to find that the decision here to include Hanshaw was so ill-conceived as to shock the conscience. We will not make out of the whole cloth plaintiffs' proffer of a <u>per se</u> constitutional violation.

### C. <u>Monell and Conspiracy Claims</u>

"[A] municipality may not incur <u>Monell</u> liability as a result of the actions of its officers when its officers have inflicted no constitutional injury." <u>Marable v. West Pottsgrove Township</u>, 176 F. Appx. 275, 283 (3d Cir. 2006) (<u>citing</u> <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 467 (3d Cir. 1989)). As plaintiffs have not been able to establish a constitutional violation on the record before us, their <u>Monell</u> claim also fails.

Conspiracy under 42 U.S.C. § 1983 requires that the plaintiffs show that two or more conspirators reached an agreement to deprive plaintiffs of their civil rights, and the conspirators acted under color of state law. <u>Adickes v. S.H.</u>

30

<u>Kress & Co.</u>, 398 U.S. 144, 150 (1970).  Plaintiffs here seek to infer an agreement to violate their constitutional rights stemming from the investigation and the actions of the defendants.  But we have canvassed the defendants' actions and found no constitutional fault with them.  We therefore cannot infer the existence of an agreement to violate plaintiffs' civil rights, and they have proffered no other evidence from which one could reasonably infer that they can establish such an agreement. Their conspiracy claim must fail.


BY THE COURT:

<u>\_\_\s\Stewart Dalzell</u>